**Etta Lois Pullard DUNN, et al.**

v.

**CONSOLIDATED RAIL CORPORATION, et al.**

**Civil A. No. 92–821–A–1.**

United States District Court, M.D. Louisiana,

June 12, 1995.

**1268**

Floyd J. Falcon, Jr. of Avant & Falcon, Baton Rouge, LA, and Joe R. Whatley, Jr. of Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, AL, for plaintiffs Etta Lois Pullard Dunn, Individually and as natural tutrix of the minors, Ladridyka Dunn and John Preston Dunn, and Cedric Darnell Dunn.

H. Alston Johnson of Phelps, Dunbar, Marks, Claverie & Sims, Baton Rouge, LA, for defendants Consolidated Rail Corp., Union Pacific R. Co., Illinois Central R. Co. and Kansas City Southern R. Co.

Brian T. Butler of the Law Firm of Grayson Brown, Baton Rouge, LA, for intervenor Travelers Ins. Co.

Gregory E. Bodin of Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, for third party defendant Schuylkill Metals Corp.

**RULINGS ON POST–TRIAL MOTIONS**

RIEDLINGER, United States Magistrate Judge.

This matter is before the court on post-trial motions filed by the plaintiffs and the defendants. The motions are opposed.

This is a wrongful death and survival action brought under state law and removed to this court on the basis of diversity jurisdiction. Plaintiffs Etta Lois Pullard Dunn and her three children, Cedric Darnell Dunn, Ladriyka Dunn, and John Preston Dunn, filed suit against the defendants, Consolidated Rail Corporation (Conrail), Missouri Pacific Railroad Company d/b/a Union Pacific Railroad Company (UP), Illinois Central Railroad (IC) and Kansas City Southern Railway Company (KCS). Kansas City Southern also brought a third-party claim against Schuylkill Metals Corporation, the employer of the decedent, Darnell Dunn. The third-party claim was based on an industry track agreement they entered into on March 10, 1960.

All parties consented to a trial before the magistrate judge. The jury returned a verdict March 1, 1994 and judgment was entered March 10, 1994.[1] All post-trial motions were timely filed.

**MOTION FOR PARTIAL NEW TRIAL ON PUNITIVE DAMAGES BY PLAINTIFFS**

Based on changes in Louisiana law and facts developed during discovery, the plaintiffs moved to amend their complaint to add claims for punitive damages against Conrail under Louisiana, New York and Pennsylvania law. The court granted the plaintiffs' motions on July 26 and September 27, 1993.[2] The jury was instructed on the law of punitive damages under both Louisiana and New York law. The jury determined that the plaintiffs had not proven their claim for punitive damages under either New York or Louisiana law. Plaintiffs now move for a partial new trial on the issue of punitive damages under Rule 59(a), Fed.R.Civ.P.

---

1. *See,* Judgment, record document number 135.

2. *See,* record document numbers 41 and 46.

Plaintiffs moved for a partial new trial on two grounds: newly discovered evidence and misconduct by the defendant during discovery and at trial. At the heart of the plaintiffs' motion for new trial are copies of two settlement agreements entered into by the Federal Railroad Administration (FRA) and Conrail on February 11 and October 7, 1993, which were received by the plaintiffs after the trial. On November 24, 1993, the plaintiffs directed to the FRA a letter request[3] pursuant to the Freedom of Information Act (FOIA) and asked for copies of "all documents related to a letter of March 27, 1992 from Gregory B. McBride to Stanley Sassic," and "any and all other documents showing any violations or alleged violations of any and all laws and regulations administered by the Federal Railroad Administration at Con Rail's Frontier Yard or Shop in or near Buffalo, New York." The request was limited to the years 1991 and 1992. In support of their motion the plaintiffs submitted copies of the settlement agreements, the affidavit of counsel Joe R. Whatley, Jr., and copies of various discovery requests, deposition notices and Conrail's responses.[4]

Defendant Conrail filed two memoranda in opposition to the plaintiffs' motion,[5] submitted the affidavit of John Chacona, Conrail's manager of FRA procedures, and an excerpt from the Rule 30(b)(6) deposition of Michael Lee Reddick taken on May 6, 1993.

### Applicable Law

In deciding whether to grant a new trial based on newly discovered evidence under Rule 59, the district court must consider whether the new facts: (1) would probably change the outcome; (2) could have been discovered earlier with due diligence; and (3) are merely cumulative or impeaching. *Diaz v. Methodist Hosp.*, 46 F.3d 492, 495 (5th Cir.1995); *Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 917 (5th Cir.1987), *reh'g denied*, 834 F.2d 425 (5th Cir.1987), *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988); *Johnston v. Lucas*, 786 F.2d 1254, 1257 (5th Cir.1986); *La Fever,*

*Inc. v. All–Star Ins. Corp.*, 571 F.2d 1367, 1368 (5th Cir.1978). New evidence that would merely affect the weight and credibility of the evidence ordinarily is insufficient for a new trial, as is evidence that is cumulative. *See,* 11 Wright & Miller, *Federal Practice and Procedure,* Civil § 2808, pp. 59–60 (1973). The burden is on the moving party to demonstrate that the new evidence clearly weighs in favor of a new trial. *Diaz,* 46 F.3d at 495.

A Rule 59 motion founded on allegations that an adverse party engaged in misconduct during discovery and trial is evaluated under the standards governing Rule 60(b)(3) motions based on fraud, misrepresentation or other misconduct of an adverse party. A Rule 60(b)(3) assertion must be proved by clear and convincing evidence and the conduct complained of must be such as to prevent the losing party from fully and fairly presenting its case or defense. *Diaz,* 46 F.3d at 496; *Longden v. Sunderman,* 979 F.2d 1095, 1103 (5th Cir.1992), *citing, Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1339 (5th Cir.1978). One who asserts that an adverse party has obtained a verdict through fraud, misrepresentation or other misconduct has the burden of proving the allegations by clear and convincing evidence. The rule applies to misconduct in withholding information called for by discovery and it does not require that the information withheld be of such a nature as to alter the result in the case. The rule is addressed to judgments that are unfairly obtained and not at those which are factually incorrect. *Rozier,* 573 F.2d at 1339.

Plaintiffs filed two memoranda in support of their motion and after review of both it is unclear exactly what factual allegations form the basis of the plaintiffs' motion. Without question the plaintiffs contend that receipt of the settlement documents subsequent to the trial warrants a new trial on punitive damages. However, in their initial memorandum the plaintiffs also stated that their motion

---

**3.** *See,* Tab 20, Plaintiffs' Submission in Support of Motion for Partial New Trial, record document number 155.

**4.** *See,* record document number 151.

**5.** *See,* record document numbers 149 and 160.

was also based on trial deposition testimony which showed that Conrail failed to produce all documents in its possession related to other car inspections at the Frontier Yard. In their reply memorandum the plaintiffs stated that they would summarize the argument that they were making for a new trial. Yet, plaintiffs did not mention or discuss their initial allegation that Conrail had withheld discovery relevant to rail car inspections. Nor did the plaintiffs discuss their request for a new trial on grounds of newly discovered evidence. In view of this lack of clarity the court will address all of the plaintiffs' allegations under both theories asserted.

### Evidence Concerning Car Inspections at Frontier Yard

■ Plaintiffs' only elaboration of this basis for the motion is found in Whatley's affidavit. Counsel for plaintiffs stated that prior to trial all documents reflecting all inspections of car number 169119 (during June and July of 1992) were requested. Conrail produced only documents reflecting inspections of the car at the time of the repairs on July 1. Yet, during the trial deposition of Conrail's corporate representative it was learned that Conrail had other responsive documents that it did not produce.

Defendant pointed out that the plaintiffs did not identify the specific testimony that supports their contention.[6] Defendant argued that it believed it had produced all responsive documents, and that even if it had not, the plaintiffs were made aware of the inbound and outbound inspection reports of the train carrying car 169119 on May 6, 1993 when they deposed Conrail's corporate representative, Michael Lee Reddick. Plaintiffs never asked for the inspection reports at that time or any time thereafter.

Plaintiffs did not address in detail their contentions related to withholding of documents about car inspections at the Frontier Yard. It is arguable whether any facts revealed in trial deposition testimony could be

considered "newly discovered evidence." Moreover, the plaintiffs have failed to argue or explain how the receipt of the inspection reports during discovery and before trial would have probably changed the outcome of the trial on the issue of punitive damages. In Whatley's affidavit he stated that the documents were important "because they would have shown the kind of inspections performed by ConRail and how long it took with such inspections." This statement does not explain or establish how the documents or information would probably have changed the jury's verdict.

Plaintiffs also fall short of proving by clear and convincing evidence that the defendant obtained the verdict on punitive damages through this alleged discovery misconduct. Plaintiffs never identified the specific trial deposition testimony supporting their argument. Their allegations and arguments are simply too vague to support such a finding. Plaintiffs have also failed to explain how this conduct prevented them from fully and fairly presenting their case on punitive damages.

### Evidence of Settlement Agreements Between the FRA and Conrail

■ Plaintiffs focused on Conrail's alleged failure to produce or deliberate withholding of documents concerning FRA inspections and citations at its Frontier Yard and evidence concerning the payment of FRA-imposed fines relating to activity at the yard. Plaintiffs argued that the settlement agreements with the FRA should have been produced in response to discovery requests and deposition notices issued before trial.[7] Conrail did not produce them and then argued at trial through the testimony of Sassic and Brereton that Conrail had not been cited, sanctioned or fined in connection with its operations at Frontier Yard, but instead was merely the victim of harassment by a zealous government bureaucrat. Plaintiffs contended that this combination of withholding discovery and then making contrary representations at trial is an adequate basis for grant-

---

**6.** Defendant speculated that the plaintiffs were referring to the testimony of Steve Brereton, and contended that Brereton was unaware of any circumstances surrounding plaintiffs' request for these documents or their production.

**7.** *See,* Tabs 6, 8, 17, 18 and 19, Plaintiffs' Submission in Support of Motion for Partial New Trial, record document number 155.

ing a new trial based on newly discovered evidence and misconduct.

Defendant asserted that any early discovery requests which would have encompassed these documents were made before the claims for punitive damages were added. Furthermore, the defendant objected to the requests as overly burdensome and irrelevant, and limited its response to alleged FRA violations related to car doors within a year prior to the accident.[8] Defendant pointed out that the plaintiffs never challenged these objections by filing a motion to compel, therefore, none of the alleged violations that were a part of the 1993 settlement agreements were subject to production under the unchallenged objection. Defendant conceded that it did not object to the plaintiffs' November and January Rule 30(b)(6) notices which called for production of documents received from the FRA related to the Frontier Yard for the period 1991 through July 27, 1992. Defendant contended that the plaintiffs were on notice from earlier objections that it would object to such broad discovery.

With regard to the content of the settlement documents themselves, Conrail argued that the agreement is not evidence admissible to prove violations of FRA regulations because the documents specifically state that the agreement does not constitute an admission that any violation has occurred. Defendant relied on Chacona's affidavit to show that even if the plaintiffs had received the documents during discovery and before trial, they would not have changed the plaintiffs' presentation or the jury's verdict on the punitive damages claim because only a very small part of the conduct addressed in the settlement agreements occurred at the Frontier Yard.

For purposes of this motion the court accepts the plaintiffs' characterization of the trial testimony of Brereton and Sassic. Nevertheless, it is clear that the plaintiffs have not made the showing needed for a new trial on the basis of newly discovered evidence or misconduct. It does appear that the settlement agreements would have been within the scope of the plaintiffs' Rule 30(b)(6) requests served on the defendant in November 1993 and January 1994.[9] However, it is not enough to show that the defendant should have produced some documents or did not truthfully respond to some discovery requests. Plaintiffs must establish that this evidence would probably have changed the jury's verdict or at least prevented the plaintiffs from fully and fairly presenting their punitive damages claim. They have not done so. First, the admissibility of the settlement documents or the information contained in them is very questionable. They are only evidence of alleged violations—not admissions that any violation occurred—and so would not be probative of wanton, reckless or malicious conduct. Second, any probative value would be vastly outweighed by the prejudicial effect of submitting such evidence to a jury. This is especially true in light of defendant's affidavit which shows that only nine of the 463 alleged violations involved the Frontier Yard and none related to repair or inspection of boxcar doors.[10]

Without deciding the question of admissibility, the court still could not conclude that it is probable that such evidence would have changed the jury's punitive damages verdict or that the plaintiffs were prevented from fully and fairly developing their case. It is evident that the plaintiffs' premise for the new trial argument rests on a mistaken characterization of the evidence in question. Plaintiffs consistently state that the settlement agreements "would have shown that ConRail was cited, sanctioned and fined by the FRA for its operations of the Frontier Yard,"[11] contrary to its position at trial that it had never been officially cited or sanc-

---

8. *See*, Tabs 9 and 12, Plaintiffs' Submission in Support of Motion for Partial New Trial, record document number 155.

9. Defendant acknowledges in its opposition that it did not object to these requests.

10. Plaintiffs appeared to question Chacona's affidavit by stating in their reply memorandum that they are not willing to accept statements from Conrail officials at face value. Without specific facts to support such allegations or any evidence to the contrary, the court has no basis to simply disregard the affidavit.

11. *See*, record document number 157, plaintiffs' reply memorandum, p. 2.

tioned by the FRA for its conduct at that yard. Plaintiffs stated further that while this argument was being made Conrail knew, according to the settlement documents received subsequent to trial, that it had been cited and fined for its conduct at the Frontier Yard.[12] Yet, the documents speak for themselves. They are settlement agreements of *alleged violations,* that clearly state that the FRA had "under consideration the institution of civil actions" to recover civil penalties. By their terms these are settlement agreements voluntarily entered into by the two entities and not a unilateral action on the part of the FRA to impose sanctions or fines on Conrail for conduct at the Frontier Yard or any other yard.[13]

Plaintiffs stated in their reply memorandum that if they had been aware of this evidence it would have been a focal point of the presentation of their case with regard to the issue of punitive damages. Plaintiffs further asserted that if they could have presented the evidence to the jury that Conrail had actually been cited and had paid fines as a result of violating federal regulations, including at the Frontier Yard, Conrail's counsel surely would not have argued to the jury that FRA's investigation was nothing more than harassment. At least the plaintiffs would have been able to rebut and discredit any such argument.

Again, these arguments must fail. They are based on a faulty characterization of this evidence, and therefore an inaccurate view of its importance and probative value. It is not likely that the settlement agreements would have been the focal point of the plaintiffs' case on punitive damages. Plaintiffs had the burden of proving wanton, reckless and malicious conduct. Evidence of two voluntary settlements of alleged violations over several years, only nine of which involved the Frontier Yard, is not evidence that would have probably changed the verdict, or been critical rebuttal or impeachment evidence, or made much difference in the development of their case.

Accordingly, the plaintiffs' Rule 59(a) motion for a partial new trial on punitive damages, is denied.

## MOTION TO AMEND JUDGMENT AND ALTERNATIVE MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND FOR PARTIAL NEW TRIAL BY DEFENDANTS

Defendants have filed various post-trial motions on issues of liability. Defendants UP,[14] IC and KCS moved under Rule 59(e), for an order amending the judgment to conform to the verdict returned by the jury. Defendants contended that the judgment entered against them is erroneous because in the jury's answer to Special Verdict Form number 8 it assigned them zero percent fault. In the alternative, third-party plaintiff KCS also moved under Rule 59(e) to alter or amend the judgment to find third-party defendant Schuylkill Metals Corporation liable to it for at least one-half of any liability imposed. This alternative motion was based on the contributory negligence of Darnell Dunn, which KCS argued must be imputed to Schuylkill under the contractual indemnity agreement between KCS and Schuylkill. In other words, if KCS has any liability, Schuylkill is obligated to pay one-half of this liability under the agreement due to the negligence of its employee.

All defendants[15] moved pursuant to Rule 50(b) for judgment as a matter of law on the

---

**12.** It could not be concluded from a review of the settlement agreements that Brereton, Sassic or counsel for Conrail were aware of the settlements or the documents reflecting those agreements.

**13.** Paragraph 2 of both agreements states:

It is expressly understood and agreed that this instrument is, and is to be construed to be, only a covenant by respondent to pay all sums due hereunder in accordance with the terms of the Agreement and, contingent upon respondent's fulfillment of that covenant, a covenant by the FRA not to sue for recovery of civil penalties. Execution of this Agreement of Settlement does not constitute an admission that any violation has occurred.

**14.** Union Pacific is the trade name for Missouri Pacific Railroad Company, also known as "MoPac."

**15.** Defendants UP, IC and KCS moved for judgment as a matter of law and for partial new trial in the alternative to their motions under Rule 59(e).

ground that there is insufficient evidence that they had custody of the rail car at the time of the accident because each one had transferred custody or *garde* of the car prior to the accident. Defendants also moved for judgment as a matter of law, asserting insufficient evidence of liability, on two grounds: (1) any alleged negligence (as to Conrail) or defect (as to all defendants) had become open, obvious and apparent by the time the accident occurred; and (2) the accident was due entirely to the fault of Darnell Dunn or Schuylkill and this was a superseding and intervening cause of the accident. In the alternative the defendants also moved for partial new trial as to liability on these same grounds, asserting that the verdict was against the great weight of the evidence. *See,* record document number 140, paragraph 12, Defendants' Motion to Amend Judgment and Alternative Motions for Judgment as a Matter of Law and for Partial New Trial.

█ Defendant Conrail moved for judgment as a matter of law on the plaintiffs' claims based on negligent inspection of the car while it was in transit to Louisiana. Conrail argued that there was insufficient evidence that the door's top retaining rail was in fact missing at the time of the transit inspections, or that the in-transit inspections of the car were performed either negligently or in violation of applicable federal regulations. Because Special Verdict Form question number 1 does not distinguish between negligent repair in New York and negligent in-transit inspections, the insufficiency of the evidence on the inspection claim requires a partial new trial on negligence-based liability as to Conrail.

Defendant Conrail moved for a partial new trial on liability under Rule 59(a) because otherwise inadmissible evidence was admitted on punitive damages claims that should not have been allowed to go to the jury. The inadmissible evidence was evidence of its assets and income and other alleged wrongs.

Conrail argued that the punitive damage claims should not have been presented to the jury because there was insufficient evidence of: (1) a survival action under Pennsylvania law and therefore no basis for application of New York or Pennsylvania law under Louisiana Civil Code Article 3546; (2) conduct amounting to wanton and reckless disregard in the repair and inspection of the car in New York to support a claim for punitive damages under New York, Pennsylvania or Louisiana law; and (3) a punitive damage claim under Louisiana Civil Code Article 2315.3.[16]

Conrail also moved for a new trial on liability on the ground that prejudicial evidence inadmissible under Rule 404(b), Fed. R.Evid., was introduced over its objection. The objectionable evidence was statements made by Dennis Wnek in October 1992, and references to an AAR audit that occurred in mid-July 1992 which was not probative of Conrail's state of mind at the time of the accident on July 27, 1992.

Defendants UP, IC, and KCS moved in the alternative for a partial new trial on liability. The basis for their motion was that inadmissible evidence of their assets and income was introduced even though there was insufficient evidence for the punitive damage claim against them to go to the jury.

All defendants moved for partial new trial on liability in negligence and under Article 2317. This motion was based on the court's decision to not allow the defendants to assert the defense of third party fault and its exclusion of evidence, jury charges, interrogatories, and arguments on that issue. Furthermore, all the defendants argued that a new trial on liability under Article 2317 is warranted because the court did not specifically charge the jury that the defendants had to have custody at the time of the accident, that custody may be transferred, that liability is not imposed for open and obvious conditions, that ownership is not always equivalent to

---

16. Conrail specifically argued that there was insufficient evidence of wanton and reckless disregard for public safety in the inspection or transportation of the rail car; insufficient evidence that lead slag was a hazardous or toxic substance; no evidence that the alleged hazardous or toxic nature of lead slag caused the injuries to Darnell Dunn; insufficient evidence that it had custody of the car at the time of the accident; and insufficient evidence due to the fact that Article 2315.3 does not allow recovery where the injured person is a consignee's employee rather than a member of the public at large.

**1274**

custody or *garde,* and that speculation does not constitute proof regarding intervening and superseding cause.

Third-party plaintiff KCS also moved in the alternative for a new trial as to the liability of Schuylkill on the third-party claim. The basis for this motion was "fairness" and because any finding of no liability under the agreement as to Schuylkill was against the great weight of the evidence.

*Applicable Law*

 Any motion that draws into question the correctness of the judgment is functionally a motion under Rule 59(e). *United States v. One 1988 Dodge Pickup,* 959 F.2d 37, 40 (5th Cir.1992). Rule 59(e) was adopted to make it clear that the district court has the power to rectify its own mistakes in the period immediately following the entry of the judgment. *White v. New Hampshire Dept. of Employment Security,* 455 U.S. 445, 450, 102 S.Ct. 1162, 1166, 71 L.Ed.2d 325 (1982). A Rule 59(e) motion can be granted if there is a change in the controlling law, new evidence not previously available becomes available, or there is a need to correct a clear error of law or prevent manifest injustice. *Natural Resources Defense Council v. United States EPA,* 705 F.Supp. 698, 702 (D.D.C.1989), *vacated on other grounds,* 707 F.Supp. 3 (D.D.C.1989).[17]

 A motion under Rule 50(b) for judgment as a matter of law (previously a motion for directed verdict or judgment not withstanding the verdict) in an action tried by a jury is a challenge to the legal sufficiency of the evidence supporting the verdict. *Hiltgen v. Sumrall,* 47 F.3d 695, 699 (5th Cir.1995).[18] A jury may draw reasonable inferences from the evidence and those inferences may constitute sufficient proof to support a verdict. In reviewing the verdict the district court is bound to view the evidence and all reasonable inferences in the light most favorable to the jury's determination. Furthermore, the district court is not free to

reweigh the evidence or reevaluate the credibility of the witnesses or substitute for the jury's reasonable factual inferences other inferences that the court may regard as more reasonable. The jury's verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did. *Hiltgen,* 47 F.3d at 700, *citing,* Rule 50(a)(1), Fed.R.Civ.P.; *Rideau v. Parkem Indus. Services, Inc.,* 917 F.2d 892, 897 (5th Cir.1990). The party against whom a motion for judgment as a matter of law is made must be given the benefit of every legitimate inference that can be drawn from the evidence. 9A Wright & Miller, Federal Practice and Procedure: Civil 2d § 2528, p. 288 (1995).

In the alternative to their motions for judgment as a matter of law under Rule 50(b), the defendants also moved for partial new trial on various grounds under Rule 59(a). Defendants asserted that certain findings of the jury were contrary to the weight of the evidence, that the court erred in some of its instructions to the jury and in failing to instruct the jury on the issue of third party fault, and that the court allowed the jury to consider prejudicial, inadmissible evidence over their objections.

 A renewed motion for judgment as a matter of law may be joined in the alternative with a motion for new trial under Rule 59. The motions have wholly distinct functions and the two are governed by entirely different standards. Although the evidence may be legally sufficient to take the case to the jury so that a directed verdict is not justified, still a new trial may be warranted where the verdict is against the great weight of the evidence. *Urti v. Transport Commercial Corp.,* 479 F.2d 766, 768 (5th Cir.1973). The court has wide discretion to order a new trial whenever prejudicial error has occurred. On a motion for new trial on grounds that the verdict is against the weight of the evidence, the judge is free to weigh all the evidence and need not view it in the light

---

**17.** *Cited* in *Forsythe v. Saudi Arabian Airlines, Corp.,* 885 F.2d 285, 288–89 (5th Cir.1989).

**18.** "While state law provides the substantive rules and tests in diversity cases, the applicable

federal standard of review for a jury's verdict is one of reasonableness." *Esposito v. Davis,* 47 F.3d 164, 167 (5th Cir.1995).

most favorable to the nonmoving party. *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir.1985); 9A Wright & Miller, Federal Practice and Procedure: Civil 2d § 2531, p. 302 (1995).[19] The court is to respect the collective wisdom of the jury and must not simply substitute its opinion for the jury's. However, if the trial judge is not satisfied with the verdict he has the right and duty to set it aside and order a new trial. *Smith*, 773 F.2d at 613. A new trial should not be granted on evidentiary grounds unless at a minimum the verdict is against the great, and not merely the greater weight of the evidence. *Herrmann v. Nicor Marine, Inc.*, 664 F.Supp. 241, 245 (E.D.La.1985).

 Other grounds for a motion for a new trial may raise questions of law arising out of substantial errors in the admission or rejection of evidence or the giving or refusal to give jury instructions. 11 Wright & Miller, Federal Practice and Procedure: Civil § 2805, p. 38 (1973). A new trial is required only if the trial judge's instructions taken as a whole give a misleading impression or inadequate understanding of the law and the issues to be resolved. *See, Bass v. International Brotherhood of Boilermakers*, 630 F.2d 1058, 1062 (5th Cir.1980). The party seeking a new trial based on an erroneous evidentiary ruling has the burden of proving that the error prejudiced a substantial right of that party. *See, Munn v. Algee*, 924 F.2d 568, 571 (5th Cir.1991), *cert. denied*, 502 U.S. 900, 112 S.Ct. 277, 116 L.Ed.2d 229 (1991); Rule 61, Fed.R.Civ.P.[20]

### Motion to Alter or Amend Judgment

 Defendants UP, IC and KCS moved under Rule 59(e) to amend the judgment[21] to conform to the verdict returned and the answers to the special interrogatories. *See,* paragraph 1, record document number 140. Plaintiffs opposed this argument, pointing out that the jury's answers to Special Verdict Form numbers 3 through 5 make it clear that all defendants were found strictly liable under Louisiana Civil Code Article 2317. Plaintiffs argued that because of that finding all defendants were correctly cast in judgment for the damages awarded. Schuylkill also opposed the motion and asserted that the findings of the jury are not inconsistent. Schuylkill argued that the jury found UP, IC, KCS liable under Article 2317, therefore, they are solidarily liable with Conrail to the plaintiffs. However, among the defendants, the defendant who actually caused the unreasonably dangerous condition must make whole the defendants who were only liable as custodians.

 A review of the judgment entered March 10, 1994 and the answers to the Special Verdict Form questions make it clear that the judgment must be amended to correct an error of law. Plaintiffs correctly point out that the jury's answers to questions 3 through 5 establish the findings necessary for a determination that UP, IC and KCS were liable under Article 2317 as custodians of the defective boxcar which presented an unreasonable risk of harm and was a legal cause of the plaintiffs' damages. *See, Ross v. La Coste de Monterville*, 502 So.2d 1026, 1028 (La.1987); *Seneca v. Phillips Petroleum Company*, 963 F.2d 762, 766 (5th Cir.1992) (elements plaintiff must prove to establish liability under Article 2317). The jury's responses to Special Verdict Form question number 8 did not negate these findings on the strict liability question. The purpose of question number 8 was not to determine whether any defendant was liable under a theory of negligence or strict liability, but to implement Louisiana's pure comparative fault system—to assess the fault of all persons whose fault contributed to the injury.

**19.** *See also*, 11 Wright & Miller, Federal Practice & Procedure: Civil § 2806, pp. 42–50 (1973).

**20. Rule 61. Harmless Error**

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

**21.** Record document number 135.

This includes an apportionment between the plaintiff and the defendant, as well as among the defendants. *See, Watson v. State Farm Fire and Cas. Ins. Co.,* 469 So.2d 967, 971 n. 9 (La.1985).

Thus, the questions on liability and comparative fault are separate and distinct inquiries. The jury's findings on questions 3 through 5 established the elements of liability under Article 2317 as to defendants UP, IC and KCS. However, the jury had to also assess the degree of negligence or fault of the parties who had been found liable. The jury decided to assign zero percent fault to the three railroads who were strictly liable under Article 2317, but not negligent.

■■■■■ Apportionment of fault among parties in a personal injury action is a task for the trier of fact. *Durant v. State ex rel Department of Transp. & Dev.,* 636 So.2d 1022, 1025 (La.App. 1st Cir.1994), *cert. denied,* 644 So.2d 637 (La.1994). Proper allocation of fault requires an analysis of each party's conduct. *Reid v. State ex rel Department of Transp. & Dev.,* 637 So.2d 618, 625 (La.App.2d Cir.1994), *cert. denied,* 642 So.2d 198 (La.1994).[22] In determining the percentages of fault the trier of fact must consider both the nature of the conduct of each party and the extent of the causal relationship between the conduct and the damages claimed. *Socorro v. City of New Orleans,* 579 So.2d 931, 942 (La.1991). That is exactly what the jury did in its response to question number 8.

Guidelines for the apportionment of fault are set forth in *Watson,* 469 So.2d at 974:

> In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

In this case, the jury assigned the largest percentage of fault to Conrail, the defendant it found to be both negligent and strictly liable, and the remainder to Darnell Dunn who was contributorily negligent. Obviously, when the jury made a relative comparison of causation and the nature of the conduct of Dunn and the defendants, it found that the three railroads that were not negligent should not be assigned any percentage of fault.

No one has advanced any argument or moved for a new trial on grounds that the jury was somehow required to assign a percentage of fault greater than zero, or that the jury's assessment of zero percent was not supported by sufficient evidence or was against the great weight of the evidence.[23]

**22.** Comparative fault principles may be applied in cases involving strict liability under Article 2317. *See, Landry v. State of Louisiana,* 495 So.2d 1284, 1290 (La.1986); *see also, Veazey v. Elmwood Plantation Associates, Ltd.,* 646 So.2d 866, 872–73 (La.1994); *Howard v. Allstate Ins. Co.,* 520 So.2d 715, 719 (La.1988). In *Veazey* and *Howard,* the court discussed some of the conceptual difficulties in applying comparative fault principles in the context of strict liability. *Veazey,* 646 So.2d at 874, n. 12; *Howard,* 520 So.2d at 719.

**23.** Neither plaintiffs or defendants argued that the jury's findings on the strict liability questions are inconsistent with the findings of zero percent fault. None of the parties objected or raised an issue of inconsistent responses after the verdict was returned, but before the jury was dismissed. "Jury verdicts are supposed to be reconciled, if possible, to validate a verdict when answers appear to conflict. The test of consistency is whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted." *FDIC v. Fidelity & Deposit Co. of Maryland,* 45 F.3d 969 (5th Cir. 1995), citing, *Central Progressive Bank v. Fireman's Fund Inc. Co.,* 658 F.2d 377 (5th Cir. Unit A 1981). To the extent it might be argued that the answers appear to conflict, the court's explanation in its ruling on the Rule 59(e) motion shows that there is no conflict. The jury's answers here represent a logical decision on the issues submitted to them. The jury resolved first the findings relative to the liability of each party and then they addressed the issue of apportionment of fault. These are distinct issues. *Central Progressive Bank,* 658 F.2d at 382. *See, Scroggins v. Sewerage & Water Board of New Orleans,* 533 So.2d 132, 136 (La.App. 4th Cir.1988) (a defendant must first be found liable for comparative fault principles to apply).

The answers to Special Verdict Form numbers 1 through 5 also establish that defendant Conrail was found liable to the plaintiffs under both theories of negligence and strict liability under Article 2317. Based on the jury's findings in the answers to Special Verdict Form numbers 1 through 5, all defendants are liable in solido as provided in the judgment.[24] Solidarity would not be affected by the fact that the defendants' liability derives from different sources or theories of law.[25] Under Article 2324 B. when the amount of recovery has been reduced in accordance with Article 2323,[26] a judgment debtor cannot be held liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed.[27] The jury's assessment of fault in this case bring this provision into operation. Darnell Dunn was found negligent and the jury assessed his percentage of negligence at 10%. Since the degree of fault attributed to him is greater than each of the percentages of fault assigned to UP, IC and KCS, these three railroads cannot be held liable for more than their degree of fault. In this case that percentage is zero. Therefore, as a matter of law defendants UP, IC and KCS cannot be held liable to the plaintiffs and the judgment must be corrected to reflect this conclusion.

**Motions for Judgment As a Matter of Law under Rule 50(b) and Alternative Motions for New Trial under Rule 59(a)**

Some motions were urged by Conrail only and others were made by all four defendants.

Defendants UP, IC and KCS moved under Rules 50(b) and 59(a) only in the alternative to their Rule 59(e) motion. However, the court will rule on these motions in the alternative in order to avoid any future problems with unnecessary delay or piecemeal litigation.

Conrail renewed its motion for judgment as a matter of law on the plaintiffs' claim based on negligent inspection while the car was in transit to Louisiana. Conrail asserted that there was insufficient evidence that the rail was missing at the time of the in-transit inspections, as well as insufficient evidence to show that its in-transit inspections were performed either negligently or in violation of federal regulations. Conrail contended that since Special Verdict Form number 1 did not distinguish between negligent repair and negligent in-transit inspections the insufficient evidence on in-transit inspections requires a partial new trial on liability based on negligence.[28] See, paragraphs 7 and 8, record document number 140.

Plaintiffs argued in opposition that the jury had more than sufficient evidence to conclude that Conrail failed to properly repair and discover that the door's top retainer was missing at the time the boxcar left New York. Plaintiffs asserted that there was also sufficient evidence that Conrail had a duty to inspect and insure that the car was safe for transportation, that this duty included making sure that the top retainer was there, and that Conrail breached this duty by failing to

---

**24.** The solidarity arises from the defendants' obligation to repair the same thing—the damages sustained by the plaintiffs. *See, Narcise v. Illinois Central Gulf Railroad Co.*, 427 So.2d 1192, 1194 (La.1983); *Williams v. Sewerage & Water Bd. of New Orleans*, 611 So.2d 1383, 1387 (La.1993); *Cormier v. Clemco Services Corp.*, 48 F.3d 179, 182 (5th Cir.1995); Louisiana Civil Code Articles 1794, 1797, and 1798.

**25.** Louisiana Civil Code Article 1797; *Williams*, 611 So.2d at 1388 (The sources of the obligors' debts "are irrelevant so long as they are both obligated to the same thing, that is, to repair the same damage.")

**26. Art. 2323. Computation of damages**

When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.

**27.** *Watson*, 469 So.2d at 971, n. 9 (although tortfeasors obligated for the same injuries continue to be solidarily liable, under Article 2324, that defendant whose fault is less than the plaintiff's owes only his percentage of plaintiff's damages).

**28.** Defendants' memorandum in support did not address each of the grounds raised in their motion. In order to avoid confusion the court will indicate the paragraph of the defendants' motion that raised the particular motion and issue.

exercise reasonable care in inspection of the car in the repair shop and after it left the shop.

Reviewing paragraphs 7 and 8 of Conrail's motion, it is unclear whether Conrail is moving for judgment as a matter of law, partial new trial or both. Therefore, the court will address both.

■ Conrail fails to explain how insufficient evidence that it was negligent in conducting its in-transit inspection could warrant judgment as a matter of law or partial new trial on liability. If there was legally sufficient evidence such that a reasonable jury could conclude that Conrail was negligent in its repair of the boxcar then there is legally sufficient evidence to support the jury's negligence finding as to Conrail. Therefore, even if Conrail were correct in its argument it would not be entitled to judgment as a matter of law on the plaintiffs' negligence claim.

■ Conrail asserted that insufficiency of the evidence on the in-transit inspection claim requires a partial new trial since Special Verdict Form number 1 did not make a distinction between negligent repair and in-transit inspections. First, Conrail never requested that the negligence claim against it be separated. Nor did Conrail request or object to the court's jury charge or Special Verdict Form on the ground that there should be separate instructions or interrogatories on these issues. Second, Conrail does not explain how a partial new trial would be warranted even assuming the evidence of negligent inspection was legally insufficient. Given all the evidence at trial, such a finding would not warrant a conclusion that the negligence verdict was against the great weight of the evidence. Conrail does not explain and the court fails to see how this could have resulted in any prejudice or error affecting the jury's ultimate finding on the question of negligence.

---

29. *See also*, plaintiffs' exhibits 1, 2, 3, 4, 5, 17, 18, 23, 24 and 27.

30. Where the evidence conflicted the jurors were required to assess the credibility of the defendants' witnesses. The jury obviously believed the

■ In its motion Conrail asserted that it was "sheer speculation and conjecture that the rail was in fact missing at the time of the transit inspections." Giving deference, as the court must, to the jury's credibility findings and weighing of the evidence, there was ample evidence from which a reasonable jury could conclude that the top door retainer was missing at the time Conrail inspected the boxcar. There was more than sufficient evidence from which the jury could infer, and so find, that not only did Conrail negligently repair the boxcar, it also negligently inspected it after repair by failing to detect that the retainer was missing before it left the Frontier Yard. The court has thoroughly reviewed the relevant trial testimony and it is unnecessary to summarize the extensive testimony and evidence taken on these issues. It is sufficient to note that the testimony of Dalton Mann, Robert S. Waite, Stanley Sassic, Harvey G. Worth and Steve Brereton, as well as the testimony of the plaintiffs' experts, Woodrow M. Poplin and John Tabony, Jr.,[29] provide more than adequate evidence to support the jury's negligence verdict against Conrail on any basis.[30] For these same reasons there is no valid argument that the jury's negligence finding against Conrail was contrary to the great weight of the evidence.

Under Rule 59(a) Conrail moved for partial new trial on liability because otherwise inadmissible evidence—evidence of its assets and income and other alleged wrongs—was admitted into evidence on punitive damages claims that should not have gone to the jury. *See*, paragraph 9, record document number 140. Conrail contended that the claims should not have gone to the jury because there was insufficient evidence to support the various elements required to prove punitive damages claims under New York, Pennsylvania or Louisiana law.

■ Conrail's argument rests upon the assumption that the punitive damages claims should not have gone to the jury. Without a renewed motion for judgment as a matter of

plaintiffs and their evidence and did not believe the defendants. This was the jury doing what a jury is supposed to do—exercising its primary function of assessing credibility and weighing the evidence.

law on the punitive damages claims it would be inappropriate for the court to address the sufficiency of the evidence. Moreover, it would be an academic and unnecessary exercise since the plaintiffs did not prevail on any of their punitive damages claims against Conrail.

The "otherwise inadmissible evidence" Conrail complains about was admissible on the issue of punitive damages. But, assuming the evidence was inadmissible because the punitive damages claim should not have gone to the jury, or for any other reason, it could not be a basis for a new trial. Conrail has not shown that admission of this evidence prejudiced a substantial right. In the damages instructions the jury was told that it could not consider the financial resources of the defendant in awarding compensatory damages, but could consider this factor in fixing the amount of punitive damages. It was clear from the instructions overall and the damages instructions in particular, that this evidence was relevant only to the claims for punitive damages. The jury instructions and verdict form also fully informed the jurors that even if they found the elements for the punitive damages claim, it was within their discretion whether to award them. The jury was reminded that it must not be motivated by bias, prejudice or sympathy in making its decision. Conrail did not request that any more specific limiting instructions be given to the jury as to its use of this evidence or any other evidence relevant only to punitive damages.

Certainly the substantial rights of Conrail could not have been prejudiced in regard to the punitive damages claim because the jury's verdict was in its favor on those issues. In light of the sufficiency and weight of the evidence on liability and the court's instructions, any argument that admission of this evidence affected the jury's liability verdict against Conrail is also unpersuasive.

Conrail also moved for a partial new trial on the ground that prejudicial evidence was introduced over its objection. *See,* paragraph 10, record document number 140. The alleged inadmissible, prejudicial evidence was the October 1992 statement of Dennis Wnek and references to a 1992 AAR audit. Conrail initially brought these evidentiary issues before the court in a motion in limine and the court found Conrail's arguments to exclude this evidence unpersuasive. The court remains unpersuaded. In its motion Conrail asserts that the AAR audit indisputably occurred in mid-July 1992. The testimony of trial witnesses, including Sassic, Brereton and Armand Ciccarelli, showed that the date of the audit was in dispute. It was up to the jury to resolve this factual dispute by evaluating credibility and weighing the evidence. Depending on the resolution of the factual question, it was then up to the jury to make reasonable inferences from this evidence.

Conrail's argument concerning Wnek's statement was that because it was taken in October 1992 it could not be relevant to Conrail's state of mind before the accident. Yet, a careful review of the document shows that the statements made by Wnek concerned events and policies that would have been in effect before the accident.

Even assuming error, Conrail has not carried its burden of showing prejudice of a substantial right. Again, Conrail could not have been prejudiced on the punitive damages claims because those claims were resolved in its favor. In the context of all the evidence presented at trial on the liability issues it is impossible to conclude that this evidence made a difference in how the jury viewed the evidence against Conrail, or affected the jury's ultimate determination that Conrail was both negligent and strictly liable for the death of Darnell Dunn.

Defendants UP, IC and KCS moved for partial new trial on liability under Article 2317 on the ground that inadmissible evidence of their assets and income was introduced even though there was insufficient evidence for the punitive damages claim against them to go to the jury.[31] *See,* paragraph 11, record document 140.

---

**31.** This evidence came in through the trial testimony of Richard B. Chandler, William Gary Griffiths and John Edward Foster.

Plaintiffs alleged a punitive damages claim against UP, IC and KCS under Louisiana law. Before the case was submitted to the jury the court granted the defendants' motions for judgment as a matter of law on the claims under Civil Code Article 2315.3. After the motions were granted the defendants never requested that the jury be instructed to disregard this evidence in determining their liability in negligence or strict liability. The jury considered the punitive damages claims against Conrail and knew from those instructions that the financial condition of a defendant could be considered if the jury decided to award punitive damages. The jury did not have to consider any punitive damage claim against UP, IC or KCS, but the jury knew from the instructions as a whole that this evidence was not to be considered in deciding any liability issues against these defendants. The jury found the defendants strictly liability but determined that they were not negligent and assigned them zero percent fault. Given these findings it is difficult to argue that evidence of the defendants' assets and income prejudiced or affected the jury's verdict against them. Defendants UP, IC and KCS have not met their burden of showing that a substantial right was affected by admission of this evidence.

█ All defendants also moved for judgment as a matter of law and partial new trial on liability (Conrail as to negligence and strict liability, and IC, UP, and KCS as to strict liability) on several grounds, asserting that the evidence was legally insufficient, or in the alternative, against the great weight of the evidence. See, paragraphs 4, 5, 6, 12, record document number 140. Defendants contended that the evidence showed without question that the defect was open, obvious and apparent by the time the accident occurred; Darnell Dunn, who had vast experience opening box car doors, was in a better position than any of the defendants to detect and eliminate the risk of harm, and failed to do so. Thus, his conduct was a superseding and intervening cause of the accident. Defendants also argued that there was insufficient evidence, or at least it was against the great weight of the evidence, for the jury to find that Dunn was only 10% at fault.

The jury had more than sufficient evidence from which to conclude that the defect was not plain and obvious at the time of the accident and that the negligent conduct of Dunn was not the sole cause of the accident. Clayton D. Nugent, Jr. was the yard foreman working with Dunn at the time of the accident. He testified that he did training for Dunn and that the training included a visual inspection of the door's rollers, top and bottom rails and door stops. Yet, every witness who was questioned on the subject testified that they had never seen a missing top door retainer, or a box car door fall off like the one in this accident. Both Mann and Bradley testified that they would not look up to check and make sure the top retainer was in place before opening the door. Bradley stated that in his 36 years with KCS he had not received any training to look for the presence of the top retainer, and that he did not notice it was missing until after the accident when it was pointed out to him by a Schuylkill employee. Mann, who investigated the accident, testified that the notation that the car had been lubricated and inspected "$\frac{6}{92}$" was eye level. Nugent also testified that he saw this stencil, and that at the time of the accident Dunn was wearing his hard hat, safety glasses and respirator. Mann examined the top of the door and testified that the side where the retainer was missing was dirty and rusty.

It is evident from the jury's findings that the jury weighed all of this evidence, along with the other evidence presented on the liability of the defendants, and found that the defect was not open and obvious and that the accident was not entirely the fault of Darnell Dunn. The jury weighed the evidence and concluded that under the circumstances Dunn could have exercised more care for his own safety. Consistent with the weight of the evidence presented, the jury determined that Conrail's fault was 90%. Based upon the entire record, a reasonable trier of fact could easily have reached these conclusions. The evidence was legally sufficient to support these findings and was not against the great weight of the evidence.

All of the defendants moved for judgment as a matter of law, and in the alternative for partial new trial on grounds that there was insufficient evidence that they had custody of the boxcar at the time of the accident because each one had transferred custody prior to the accident. Defendants argued that they each had transferred *garde* of the boxcar so that it was in the custody of Schuylkill at the time of the accident.[32]

■■■ Mere transfer of physical possession does not equate to a transfer of *garde*, and mere physical presence of a thing on one's premises does not constitute custody. *See, Haydel v. Hercules Transp.,* 654 So.2d 408, 414 (La.Ct. 1st Cir.1995); *King v. Louviere,* 543 So.2d 1327, 1328–29 (La.1989).[33] It is undisputed that Conrail owned the boxcar involved in the accident, but did not have actual physical possession of it at the time of the accident. Ownership creates the presumption of *garde*, but this presumption is rebuttable by the owner. *See, Doughty v. Insured Lloyds Ins. Co.,* 576 So.2d 461, 464 (La.1991).[34] The fact that Conrail did not have physical possession of the boxcar when the accident occurred is insufficient to rebut the presumption of *garde* in this case. Conrail did not introduce any evidence that it never had the boxcar in its possession, or never had the right to exercise supervision or control over it. No evidence was introduced that Conrail did not receive benefit from the boxcar, or did not continue to have the right

to control and supervise it even after it left Conrail tracks. To the contrary, the evidence was that Conrail continued to have the rights and responsibilities of ownership after the boxcar left its tracks and was received by the other railroads on the way to its destination.[35] The jury's finding that Conrail had custody was not against the great weight of the evidence and was supported by legally sufficient evidence.

■■■ As to UP and IC, however, judgment as a matter of law should be granted in their favor on the plaintiffs' claim under Article 2317. The court finds that under the applicable law, the plaintiffs failed to produce evidence from which a reasonable jury could infer that they had *garde* of the defective boxcar. The evidence presented was that UP and IC had a duty to inspect the boxcar while it was on their track and deliver it in a safe condition to the next railroad or customer; that they were responsible for damage to the car which occurred after it was received on their track and they could reject, or "bad order," the car if they found it unsafe or in need of repair. Once Conrail's boxcar was received on the tracks of KCS and accepted by its inspectors, UP and IC no longer had control or supervision over it. Furthermore, once the boxcar left their tracks there is no evidence that they had any continued right to exercise supervision and control.[36] After the car left their tracks there is no evidence that UP or IC had a legal relationship or any

---

**32.** None of the defendants argued that they did not receive benefit from the ownership or use of the boxcar.

**33.** In *King* the Louisiana Supreme Court elaborated on the concept of garde under Article 2317. "[T]he person who has the garde of a thing is he who has the legal duty to prevent its vice or defect from harming another." The determination of whether one has this legal duty is made through a process of policy considerations similar to that used in determining other delictual duties. The court then summarized several principles to assist the trier of fact in determining custody or garde: (1) liability arises from the guardian's legal relationship to the thing whose defect creates an unreasonable risk of injury to others; (2) garde is the obligation imposed by law on the proprietor of a thing, or on one who avails himself of it, to prevent it from causing damage to others; (3) the things in one's care are those things to which one bears such a relation-

ship as to have the right of direction and control over them and to draw some kind of benefit from them; and (4) the guardian is in a better position than the innocent victim to detect, evaluate and take steps to eliminate an unreasonable risk of harm arising in the thing. *King,* 543 So.2d at 1328–29.

**34.** "Under most circumstances ownership alone establishes the requisite benefit, control and authority to find garde." *Doughty,* 576 So.2d at 464.

**35.** For example, see plaintiffs' exhibit 46, *Field Manual of the A.A.R. Interchange Rules,* Rules 1, 88, 89, 95, 96, 108.

**36.** The boxcar's movement from New York to Baton Rouge and when it was on the tracks of each railroad were part of the stipulated facts read to the jury. *See,* pre-trial order, record document number 62.

other type of relationship with the boxcar such that one could reasonably conclude that they had a right of control or were in a better position than an innocent victim to find and eliminate the unreasonable risk of harm it presented. Thus, the evidence is legally insufficient to support a finding that at the time the defective boxcar caused the plaintiffs' damages UP and IC had custody of it within the meaning of Article 2317.

For these same reasons the jury's finding as to custody and liability under Article 2317 is also against the great weight of the evidence.[37] Yet, under the circumstances of this case there would be no reason for ordering a partial new trial as to UP or IC. The jury's allocation of zero percent fault to these defendants means that they will not be responsible for any of the plaintiffs' damages.

Accordingly, under Rule 50(b), the motion by UP and IC for judgment as a matter of law on plaintiffs' claim under Article 2317 is granted. The alternative motion for partial new trial by UP and IC is denied.[38]

■■■ The evidence presented as to KCS was that the boxcar was on its sidetrack within the Schuylkill plant; that it had been cut out of the train but was still attached to a KCS locomotive and being moved for weighing and unloading. KCS had the responsibility to deliver a safe boxcar to its customers. While on the KCS track, KCS had the right and duty to inspect, direct and control the boxcar. On its track, at any point in time, KCS had the authority and duty to bad order the car as unsafe and arrange for it to be repaired and made safe.

■■■ Whether the law imposes a duty of *garde* is a factual inquiry. *Baudoin v. McDermott, Inc.*, 644 So.2d 799, 801 (La.App. 1st Cir.1994). There was sufficient evidence

such that a reasonable trier of fact could conclude that KCS had custody of the defective boxcar. In light of all the evidence the jury's finding on the custody issue was not against the great weight of the evidence.

Accordingly, the motion for judgment as a matter of law under Rule 50(b) by KCS is denied, and the motion for partial new trial by KCS on this ground is also denied.

■■■ Defendants raised again the issue of third party fault. They moved for partial new trial on liability based on error in the court's ruling excluding this defense. Additionally, the defendants moved for judgment as a matter of law and partial new trial asserting that there was insufficient evidence of liability or in the alternative that any verdict of liability was against the great weight of the evidence because the fault of Schuylkill was an intervening and superseding cause of the accident. In response the plaintiffs relied upon the arguments made at trial and the court's ruling. Schuylkill submitted that the court's ruling on the motion at trial was correct and that any error in excluding this defense was harmless. Any error was harmless because no evidence was presented that an employee of Schuylkill other than Darnell Dunn was negligent, and the jury's finding on the third-party demand by KCS found Schuylkill free of any fault.

The court has reviewed the pleadings filed on the motion in limine, defendants' responsive pleadings, both pre-trial orders and the ruling made at trial. *See,* record document numbers 2, 16, 39, 48, 50, 62, 111, 117, 125. After this review, the court readopts the ruling and reasons given at trial. Neither by their pleadings or pre-trial inserts, did the defendants ever put the plaintiffs on notice that third party fault would be asserted as a defense to the plaintiffs' claims.[39] Defen-

---

**37.** Again, these rulings are strictly in the alternative to the court's ruling granting the motion to alter or amend the judgment under Rule 59(e) by UP, IC and KCS.

**38.** Rule 50(c)(1) provides that if the renewed motion for judgment as a matter of law is granted, "the court shall also rule on the motion for new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for

the new trial." *See, Arenson v. Southern University Law Center,* 43 F.3d 194, 197 (5th Cir.1995).

**39.** With the adoption of comparative fault, the fault or non-fault and the percentage of fault attributable to each person, whether party to the lawsuit or not, is relevant in the determination of damages which an injured plaintiff may recover. *See, Nance v. Gulf Oil Corp.,* 817 F.2d 1176, 1180 (5th Cir.1987). However, the defendants cited no authority that this relieves a party from the obligation of pleading the fault of a third party

dants pointed out that from the time of the third-party demand of KCS the plaintiffs were aware that the fault of Schuylkill was an issue in the case and participated in discovery related to this claim. However, the plaintiffs' participation in discovery on a third-party claim is not equivalent to the plaintiffs being put on notice that they had to develop trial strategy and prepare to defend against the assertion that another party besides the defendants was liable.[40]

Assuming it was error for the court to exclude third party fault as an issue in the plaintiffs' case, substantial rights of the defendants were not affected. Evidence of the conduct of other Schuylkill employees and its employee policies and training in loading and unloading railroad cars was presented on the third-party demand. If this evidence had been considered on the issue of third party fault, in light of all the evidence presented relative to the liability of the defendants, the verdict would still have not been contrary to the great weight of the evidence and a reasonable trier of fact would still have had more than sufficient evidence to conclude that the defendants were negligent or liable under Article 2317. Furthermore, the jury evaluated the safety policies, rules and training Schuylkill provided to its employees and found no breach of Schuylkill's contractual duty. Though the specific question addressed by the jury was in the context of a breach of contract claim and the interrogatory essentially tracked the language of the contract, the question in substance was what

the jury would have had to determine if it had been asked to assess the negligence or fault of Schuylkill as a defense to the plaintiffs' claims. Therefore, if presented with the defense of third party fault the only reasonable conclusion is that the jury would have responded just as it did to the third-party demand.

■ All four defendants also moved for partial new trial based on objections to the court's instructions to the jury. *See,* paragraph 14, record document number 140. Defendants asserted that it was error for the court not to specifically charge the jury on intervening and superseding cause.[41] Such a specific instruction was unnecessary. The legal cause instruction given by the court made it clear that there could be more than one cause which contributes to producing damage. The jury was instructed on the defendants' claim that Darnell Dunn was contributorily negligent. The jury interrogatories were consistent with this instruction and asked whether the conduct of any of these parties was a legal cause of the plaintiffs' damages. If the jury's conclusion from the evidence was that the conduct of the defendants was not a legal cause, and that only the negligence of Darnell Dunn was a legal cause of the plaintiffs' damages, then only he would have been found at fault. Thus, the instructions as a whole coupled with the questions of the Special Verdict Form gave an adequate understanding of the law and the issues the jury needed to resolve. A specific instruction on intervening and su-

who it contends is also at fault and liable for the plaintiff's damages.

**40.** Since the court affirms its ruling at trial on the issue of third party fault, the defendants' motion for partial new trial based on the assertion that this ruling was incorrect (including the exclusion of evidence and the omission of the defense from the jury charges and special verdict form) is denied. *See,* paragraph 13 of defendants' motion, record document number 140. Specifically, as to IC, UP and KCS the motion for partial new trial is also denied on grounds that any error did not affect their substantial rights. These defendants will not be held liable for any of the plaintiffs' damages since the jury assigned them zero percent fault and this finding has not been challenged.

It is unclear why the defendants included as a basis for this motion for partial new trial evi-

dence and argument "pertaining to the original state of the welds on the box car." In their trial memorandum defendants stated that they were not raising the defense of third party fault on the part of the manufacturer or requesting that the jury allocate any percentage of fault to the manufacturer. Defendants asserted that the evidence was from the plaintiffs' own files and offered to show why the missing top retainer was not apparent on inspection in Buffalo, and to rebut the plaintiffs' allegations that Conrail acted with intent or recklessness. If the court did exclude this specific evidence or defense in error, the defendants have failed to show how their substantial rights have been affected by this error. Therefore, any motion for new trial on this basis is denied.

**41.** *See,* defendants' requested jury instruction number 32, record document number 118.

perseding cause as proposed by the defendants would not have added anything helpful to the jury's understanding of the issues before them and in fact would have given a misleading impression that there could only be one legal cause of the plaintiffs' damages.

■ Defendants contended that the jury should have been specifically charged that speculation and conjecture do not constitute proof. *See*, defendants' requested jury instruction number 30, record document number 118. This instruction was unnecessary. The court told the jury several times in the instructions that their verdict must be based solely on the evidence presented at trial. The jury was also accurately instructed on the burden of proof in a civil case both at the beginning and end of the trial. These instructions as a whole gave the jury an adequate understanding of the law and proper guidance in their consideration of the evidence. Defendants' proposed instruction would likely have confused the jury as to the proper standard for the burden of proof in a civil case, and would not have clarified or added anything that was missing in the instructions given.

■ Defendants contended that the jury should have been instructed that liability is not imposed for open and obvious conditions.[42] Again, such an instruction was unnecessary. The jury was adequately instructed on the definition of reasonable care both as to the plaintiffs' negligence and strict liability claims and the defendants' claims of contributory negligence and victim fault. This explanation implicitly incorporated the defendants' proposed instruction as a factor for consideration in evaluating whether any party exercised reasonable care under all the circumstances.

■ Lastly, the defendants claimed the court erred in its instructions to the jury on the issue of custody or *garde*, under Article 2317. Defendants asserted that the court should have specifically charged the jury that ownership is not always equivalent to custody; that custody may be transferred, and that a defendant must have custody at the time of the accident.[43] The court charged the jury as follows on the issue of custody: "Under the law a particular defendant has custody of the boxcar if it is the owner of it, or it was in a position to exercise supervision or control over it, and to draw benefit from it." This instruction is almost exactly the same instruction approved by the Fifth Circuit in *Dobbs v. Gulf Oil, Co.*, 759 F.2d 1213, 1217 n. 9 (5th Cir.1985). The instruction was given in the alternative and, taken as a whole, adequately conveyed that the owner, as well as a nonowner who exercised supervision or control and drew benefit, could have custody within the meaning of Article 2317.[44]

It is correct that custody of a thing under Article 2317 is not necessarily equivalent to ownership, and that the owner may transfer custody. *Haas v. Atlantic Richfield,* 799 F.2d 1011, 1014 (5th Cir.1986);[45] *Blansit v. Hyatt Corp. of Delaware,* 874 F.2d 1015, 1017 (5th Cir.1989).[46] However, the facts of this case did not warrant such an instruction. Custody within the meaning of Article 2317 is a factual inquiry. *Doughty,* 576 So.2d at 464. All of the cases relied upon by the defendants were cases where the owner never actually had physical custody of the thing or never actually exercised supervision, di-

---

**42.** None of the defendants' proposed instructions were phrased exactly this way, but two contained these concepts. *See*, defendants' instruction numbers 23 and 35, record document numbers 99 and 118.

**43.** *See*, defendants' proposed instruction numbers 1 and 2, record document number 99.

**44.** The court assumes that when the defendants use the term "custody" they mean as the term is defined under Article 2317 and not actual physical custody of the thing.

**45.** "Ownership is an important, albeit not controlling, element in determining the custody issue." *Haas,* 799 F.2d at 1014 n. 3.

**46.** "Although this relationship is ordinarily associated with ownership, the owner may transfer the guardianship by transferring the thing to another, such as a bailee, lessee or usufructuary, who will bear such a relationship to the thing as to himself have the custody (guardianship) of it." Citing, *Loescher v. Parr,* 324 So.2d 441, 449 n. 7 (La.1975).

rection or control.[47] No such evidence was offered or argued by Conrail. Conrail did not present evidence that it never had physical custody of the boxcar, never exercised control over it, or did not continue to have the right to supervise and control it after physical custody was transferred to the other railroads.

■ The law in Louisiana is clear that one "may lose the actual physical custody of a thing without losing its '*garde.*'" *Haas,* 799 F.2d at 1014, *citing, Loescher,* 324 So.2d at 447 n. 6. Furthermore, an owner who has title and possession of a thing which contains a defect and merely transfers physical custody of the thing to another, still has *garde* for purposes of Article 2317.[48] These cases controlled under the circumstances of this case. In addition, under Louisiana law, the absence of ownership on the part of IC, UP, and KCS clearly did not end the inquiry. As nonowners they were custodians within the meaning of Article 2317 if they were in a position to exercise supervision or control over the boxcar and to draw benefit from it. *See, Baudoin v. McDermott,* 644 So.2d at 801. This is the charge that the jurors were given. The instructions requested would have confused and mislead the jury in their deliberations as to all of the defendants.[49] If the court had

given the requested instructions the jury likely would have equated physical possession with *garde* (i.e., transfer of physical custody is a transfer of *garde*) or concluded that only one with physical possession at the time of the accident can have *garde.*[50]

■ Even assuming some error in the court's instruction on the issue of custody under Article 2317, none of the defendants established that their substantial rights were affected by the error. Conrail was found liable in both negligence and strict liability. The jury was clearly instructed on these two separate legal theories but told that even if the plaintiffs prevailed on both claims they could have only one recovery. If the strict liability verdict as to Conrail must be disregarded because of an erroneous instruction on custody, this would not affect the jury's finding that Conrail was negligent. The other three defendants were found liable under Article 2317; however, the jury's finding that they were zero percent at fault means that they are not liable to the plaintiffs for any damages. Therefore, any error in the custody charge would not have affected the substantial rights of the defendants.

In the event that the motion to alter or amend the judgment by IC, UP and KCS was not granted, KCS moved in the alterna-

**47.** *See, Doughty,* 576 So.2d at 465 (La.1991). *Doughty* involved a planer used in a saw mill. Mrs. Doughty was an owner of the planer by virtue of the community property laws and that interest was remote. Her ownership interest gave her no authority or control over the operation of the saw mill or its movables. Thus, she was in no better position than an innocent victim to detect, evaluate or take steps to eliminate the unreasonable risk of harm. Similar to *Doughty, Myers v. Ford Motor Co.,* 486 So.2d 1030, 1040 (La.App. 2d Cir.1986), involved a vehicle but also addressed the issue of "garde" in the context of a spouse who was co-owner of a vehicle that was not in her name, and over which she never exercised supervision or control. *Herron v. Lincoln Property Co.,* 525 So.2d 1189, 1190 (La.App. 5th Cir.1988), was also cited by the defendants. However, like *Doughty* and *Myers,* it is also factually dissimilar to the present case. *Herron* was a case involving the owner of a building and property under construction and the court stated that under the facts the owner never had custody of the building in the first place and only generally supervised the construction.

*See also, Ellison v. Conoco, Inc.,* 950 F.2d 1196, 1208–09 (5th Cir.1992), *cert. denied,* ——

U.S. ——, 113 S.Ct. 3003, 125 L.Ed.2d 695 (1993); *Touchet v. Estate of Bass,* 653 So.2d 83, 87–88 (La.App. 3d Cir.1995) (family owned lumber but never had physical possession of it and had insufficient control over the construction of boat house and dock).

**48.** *See, Ross,* 502 So.2d at 1032; *King,* 543 So.2d at 1329; *Lucas v. Deville,* 526 So.2d 1264, 1267 (La.App. 3d Cir.1988); *Detillier v. Scafco, Ltd.,* 507 So.2d 829, 831 (La.App. 5th Cir.1987), *cert. denied,* 508 So.2d 820 (La.1987).

**49.** *See,* defendants' requested instructions number 1 and 2, record document number 99.

**50.** Louisiana jurisprudence does not preclude the possibility that under Article 2317 more than one defendant may be the custodian. *See, Royer v. Citgo Petroleum Corp.,* 53 F.3d 116, 119 n. 2 (5th Cir.1995); *Arceneaux v. Domingue,* 365 So.2d 1330, 1335 (La.1978); *King,* 543 So.2d at 1330; *Ehrman v. Holiday Inns, Inc.,* 653 So.2d 732 (4th Cir.1995) (more than one party may have custody or garde under Article 2317; *but see, Jacobs v. Spinnakers,* 474 So.2d 1019, 1022 (La.App. 5th Cir.1985), *cert. denied,* 478 So.2d 149 (La.1985).

tive to amend the judgment to make Schuyl-kill liable under their indemnity agreement for at least one half of any liability imposed upon KCS by the jury verdict or judgment of the court. In the alternative, KCS also moved for a new trial on the third-party claim against Schuylkill, asserting that the jury's verdict on that claim was against the great weight of the evidence. *See*, paragraphs 2 and 15, record document number 140.

■ Regardless of the outcome of the motion to amend the judgment by IC, UP and KCS, the fact remains that the jury determined that zero percent fault be assigned to KCS. As a result KCS will have no liability for any of the plaintiffs' damages, and so there is no basis for a claim by KCS against Schuylkill under the indemnity agreement. There is also no basis for granting a new trial on the third-party claim. Again, there is no reason to grant a new trial as to KCS when it has no liability for the plaintiffs' damages based on the jury's assessment of fault. Furthermore, the jury's finding was not against the great weight of the evidence. Much of the evidence as to Schuylkill's conduct relevant to the third-party claim was undisputed. The jury made its credibility assessments, weighed this evidence and obviously drew the inferences from this evidence favorable to Schuylkill. Considering the entire record there is no basis to conclude that the verdict on the third-party claim was against the great weight of the evidence.

Accordingly, the motion by UP, IC, and KCS, to alter or amend the judgment under Rule 59(e) is granted. In the alternative, the motion by UP and IC for judgment as a matter of law under Rule 50(b) is granted; and the motion for partial new trial by UP and IC under Rule 59(a) is denied; the motion for judgment as a matter of law and partial new trial by KCS is denied. On the third-party claim by KCS against Schuylkill, the motion to alter or amend the judgment under Rule 59(e) or for partial new trial under Rule 59(a) by KCS is denied. The

motions for judgment as a matter of law under Rule 50(b) and for partial new trial under Rule 59(a) by Conrail are denied.

### *ALTERNATIVE MOTION FOR PARTIAL NEW TRIAL ON QUANTUM BY CONRAIL* [51]

Defendant moved for an order of remittitur, or alternatively for a new trial, as to the awards for general compensatory damages. Defendant contended that the awards of $1,100,000.00 to Etta Dunn and $550,000.00 to each of the three children are excessive as a matter of law. Defendant's principal argument is that these awards are so disproportionate to past awards for similar injuries that they exceed the bounds of any reasonable recovery in this case. Defendant engaged in a review of Louisiana wrongful death cases and relied on those where the general damage awards to a surviving spouse and children were $500,000.00 and $300,-000.00, respectively. Defendant argued that the facts of the present case could not be distinguished from those awards which were upheld as closely approaching the maximum the jury could have properly awarded.

Plaintiffs conceded that the cases cited by the defendant represent the highest reported awards, but disagree that the jury erred as a matter of law in awarding larger amounts under the facts of this case. Plaintiffs argued that the general damage verdicts do not shock the judicial conscience or represent a clear abuse of the jury's discretion. Plaintiffs contended that before comparing the size of the verdict with prior wrongful death cases, the court must first decide whether the awards shock the judicial conscience. Plaintiffs submitted that given the facts these awards simply do not shock the conscience of a reasonable person. Plaintiffs also argued that since the damage awards of $500,000.00 in similar cases were decided a decade ago, inflationary factors justify a substantial increase in wrongful death cases.[52] Plaintiffs also urged the court to consider similar cases in jurisdictions other than Louisiana and the Fifth Circuit.

---

**51.** The other three defendants join in this motion in the alternative to their post-judgment motions.

**52.** Plaintiffs cited no authority for this argument.

In its reply memorandum the defendant disputed the plaintiffs' contention that inflation is a factor to consider, or that this court can look to awards in other parts of the country in order to determine whether the size of the verdict in this case was reasonable or shocks the conscience. Defendant concluded that while the jury may have been justified to make its award at the high end of the scale, it was clearly beyond its discretion to award to the plaintiffs more than twice the highest prior award to a surviving spouse, and almost twice the highest prior award to a surviving child.

Neither defendant Conrail nor the court disputes the plaintiffs' summary and characterization of the evidence presented at trial concerning the extraordinary role Darnell Dunn played in the lives of his wife and three children. Dunn shared an exceptionally close relationship with his wife and children; he was the center and strength of all their lives and an exemplary husband and father. The effect of his death on the family is indeed difficult to put into words or express as money damages. Nonetheless, the court must address the basis for the defendant's motion in light of the controlling legal standards.

### Applicable Law

■■■■■ A Rule 59 motion is an appropriate means to challenge the size of a verdict. A court may grant relief if the verdict is excessive or inadequate as a matter of law, or if the size of the verdict is against the weight of the evidence. 11 Wright & Miller, Federal Practice and Procedure, § 2807, p. 50 (1973). A jury's assessment of damages is entitled to great deference by a reviewing court and is not to be disturbed unless it is entirely disproportionate to the injury sustained. The extent of distortion that warrants intervention is an award so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate bias, passion or other improper motive, or so clearly exceeding the amount that any reasonable person could feel the claimant is entitled to recover.[53] The touchstone must be the facts and circumstances in the record of the individual case. *In Re Air Crash*, 767 F.2d at 1156. However, prior awards may be of some aid in determining excessiveness when the present award is shown to be greatly disproportionate to past awards for similar injuries. *Haley v. Pan American World Airways*, 746 F.2d 311, 317 (5th Cir. 1984). The decision whether to reduce an award cannot be supported entirely by rational analysis and is "inherently subjective in large part, involving the interplay of experience and emotions as well as calculation."[54]

It is evident that there is a great disparity between the awards to the plaintiffs here and past Louisiana awards for similar injuries. Since the quantum of damages under review is approximately double the highest past awards,[55] the court cannot limit its review

---

**53.** *In Re Air Crash Disaster Near New Orleans, La.*, 767 F.2d 1151, 1155 (5th Cir.1985).

**54.** *In Re Air Crash*, 767 F.2d at 1156; *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir.1983).

**55.** The exception to this statement is the recent decision of *Aime v. Seaboard System Railroad*, 648 So.2d 20, 22 (La.App. 4th Cir.1994), *cert. denied*, 649 So.2d 417 (La.1995), which was rendered after the trial of this matter. The decedent was killed in a car-train accident in September 1984. The trial court awarded $900,000.00 to the surviving spouse and $700,000.00 to the surviving child, who was a minor at the time of the accident. The decedent was assigned 40% and the City of New Orleans 60% of the fault. In affirming the high awards the court gave few details, commenting that the trial court had given ample reasons to support the award, including the close bonds between family members and the emotional trauma experienced by the surviving spouse and child. However, it appears from the date of the accident and the facts given, that the amounts were compensation for suffering that occurred over a very long period of time. The court stated that the wife had experienced years of shock and depression, and that the surviving child experienced a great void in her life, especially on the occasion of her wedding and high school and college graduations.

It is evident that the high general damage award in *Aime* compensated many years of mental anguish, which makes it factually dissimilar to the present case. Moreover, the decision is not helpful for purposes of comparison and analysis of the proper award in this case because the court did not provide a detailed factual basis in affirming the trial court's award.

only to the facts of this particular case.[56]

### General Damage Award to the Surviving Spouse

At the time of trial, the highest reported general damage award to a surviving spouse in a Louisiana wrongful death action was in the case of *Risley v. State Farm Fire and Casualty Company*, 620 So.2d 950 (La. App. 3d Cir.1993). In *Risley* the wife of the decedent was awarded $500,000.00 for loss of "love and affection of her husband and grief and anguish," and $30,000.00 for loss of "society and consortium." The court of appeal summarized the relevant facts supporting the jury's verdict. Plaintiff, nearly 70, and the decedent, 77 years old, had been married for 50 years and had done everything together. The decedent had been a hard working and loving husband. Because the plaintiff was a diabetic the decedent had taken care of all her needs by paying all the bills, cooking, grocery shopping, and taking care of the car, house and yard. The court noted that the decedent was very close to his wife and children and that the family was exceptionally close. The record established that the closeness was attributable to the decedent who organized family gatherings and fostered and encouraged that closeness. Appellants contended that the highest amount within the jury's discretion was $200,000.00. In affirming the award of $530,000.00 the court of appeal noted that the plaintiff relied on him for just about everything and he accepted this responsibility with love. The court described her loss as "immeasurable."

The Louisiana Fourth Circuit in *Bourgeois v. Puerto Rican Marine Manage.*, 589 So.2d 1226, 1241 (La.App. 4th Cir.1991), *cert. denied*, 592 So.2d 1300 (La.1992), reduced a $1,000,000.00 general damages award to a surviving spouse. Noting that such awards do not often exceed $300,000.00,[57] the court nevertheless found that the jury had the discretion under the facts of the case to give a higher award than that amount. The decedent was 58 years old at the time of death and the testimony was that he was an "exemplary husband, father, and grandfather." The court reduced the general damages to $500,000.00.

In *In Re Air Crash*, the plaintiff lost his wife and three small children when the fuselage of a crashing plane completely destroyed his home. The court stated that there was testimony concerning the plaintiff's problems with readjustment and maintaining normal relationships. The jury had awarded $1,500,-000.00 and the court reduced the amount to $500,000.00. The court noted that at that time the highest reported Louisiana state court award for loss of love and companionship of a spouse was $200,000.00.[58] The court stated that it based this figure primarily on the evidence in the case and secondarily on the guidance provided by awards approved for "similar injuries by the Louisiana appellate courts and the decisions of this court applying Louisiana law." *In Re Air Crash*, 767 F.2d at 1157.

In its review of prior awards the court cited *Winbourne v. Eastern Airlines, Inc.*, 758 F.2d 1016 (5th Cir.1984), *cert. denied*, 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 582 (1985), a case where the plaintiff had lost his wife and two children—his entire family. The Fifth Circuit affirmed the district court's award of $500,000.00. The evidence established that the plaintiff remained lost and

---

**56.** Plaintiffs' argument that this court should look to similar cases in other jurisdictions is unpersuasive. The Fifth Circuit did cite cases from other parts of the county in *Caldarera*. However, in its more recent decisions the court has not looked to similar cases from other jurisdictions. In reviewing the denial of a motion for remittitur or in the alternative for a new trial, in *Marcel v. Placid Oil Company*, 11 F.3d 563, 568 (5th Cir.1994), the court stated without discussion: "We review a claim of excessiveness by comparing the awards at issue with rulings in other factually similar cases decided under controlling law, here Louisiana law." In footnote 8 the court also specifically addressed the plaintiff's argument that the court could not compare cases to determine whether an award is excessive. The court did not accept the plaintiff's argument and cited its recent cases that hold that case comparisons are appropriate.

**57.** The court in *Bourgeois*, cited these prior awards in footnote 5. The court has reviewed all of these cases, but for purposes of this motion it is unnecessary to review the facts of all theses decisions in this ruling.

**58.** Citing, *Cheatham v. City of New Orleans*, 378 So.2d 369 (La.1980).

disturbed as a result of his loss; he had gone from a very happy family man, "vigorous in his life and work," to a man crushed by sudden tragedy.[59] The court also noted that the depth of the plaintiff's devotion and identification with his family was unique and unquestioned. *Winbourne,* 758 F.2d at 1018. [60]

After careful review of the facts of this particular case, the only reasonable conclusion is that the award of $1,100,000.00 to Etta Dunn is excessive. It clearly exceeds the amount that any reasonable person could have awarded when compared with the highest recoveries under similar circumstances for surviving spouses in Louisiana.

▬ The more difficult task is determining the amount which the jury could permissibly have awarded. In deciding the size of a remittitur, the Fifth Circuit applies the "maximum recovery rule" which translates to "the maximum amount the jury could properly have awarded." *Marks v. Pan American World Airways, Inc.,* 785 F.2d 539, 541 (5th Cir.1986); *Caldarera,* 705 F.2d at 784. However, the maximum recovery rule does not necessarily limit an award to the highest amount previously recognized in the state. *Douglass v. Delta Air Lines, Inc.,* 897 F.2d 1336, 1344, n. 14 (5th Cir.1990).[61]

The record in the present case closely resembles the decisions of the Louisiana and Fifth Circuit courts which have reduced to, or upheld, $500,000.00 general damage awards to a surviving spouse. All the adjectives used by those courts to describe the devotion, dependence and closeness of the relationships in those cases can be applied to the present case without hesitation. Furthermore, the evidence in the record of this case can be distinguished in several respects such that the court must conclude that the jury was within its discretion to award a quantum of damages higher than the highest amounts previously awarded to a surviving spouse in a wrongful death case.

The Dunns had been happily married for over 20 years at the time of Darnell Dunn's death. Plaintiff's testimony established that their marriage and family relationships were exceptionally close and that Darnell Dunn was an exceptionally hard-working and loving husband, totally devoted to her and their children. His death was a profound loss to her and the family. Etta Dunn testified that they had a very active social and family life. As a married couple they took trips and regularly attended Southern University football and basketball games, and also went to neighborhood functions, picnics, amusement parks and sports events as a family. The evidence established that the couple had also endured the difficult times together. Etta Dunn had experienced some serious health problems during their marriage. Their son Cedric is deaf. Ladriyka had a congenital heart disease and migraine headaches, and John Preston had once suffered a seizure where he did not blink his eyes for three days. As a father Darnell Dunn was extremely close to his children and involved in their lives—playing sports with them and helping them with their homework. Etta Dunn testified that after her husband's death she took time off from her teaching job because she was crying too much at school. She also stated that after her husband's death she did not know how to sign her name and still has trouble being around his parents and people with whom they used to spend time. Plaintiff testified that she and her husband had been talking about moving because gun shots at night were becoming a regular occurrence in their neighborhood.

59. In *Winbourne* the court cited and compared the facts with its decision in *Caldarera,* 705 F.2d at 783. In *Caldarera* the plaintiff lost his mother, wife and eight year old son, but still had his four year old son with him. Caldarera was awarded $400,000.00 for the emotional loss of his wife.

60. The Fifth Circuit affirmed a jury award of $500,000.00 for loss of love, affection and household services in *Osburn,* 825 F.2d at 920. *Osburn* was not a wrongful death case, but a personal injury action by the Osburns claiming that Mr. Osburn's contraction of leukemia was a result of the defendants' failure to warn him of the dangers of chloramphenicol. The court cited its affirmation of awards of $500,000.00 in *In Re Air Crash* and *Winbourne* and noted that the evidence indicated that the Osburns enjoyed a close, loving and happy marriage for almost 20 years.

61. Simply because certain awards have been affirmed does not mean that they are the highest or near the highest awards which might be awarded. *In Re Air Crash,* 767 F.2d at 1156.

Plaintiff now goes to bed with a revolver and has trouble sleeping. During the night she is often awake checking the doors and windows and the children.

She is receiving counseling to help cope with her grief and loss and is taking medication for depression and to help her sleep. Dr. James Brabham, the clinical psychologist who is treating Etta Dunn and her children for depression and grief reaction, testified at the trial. He stated that although he is optimistic the family will recover from the grief it will take them longer to get over the loss because Darnell Dunn was the emotional anchor, the "rock of the family." He was the family decisionmaker and disciplinarian and the family was very dependent upon him. Brabham testified as to the difficulty Etta Dunn was having in dealing with her children's behavior since her husband's death. Brabham described the family as "falling apart" and stated that his goal was to help Etta Dunn learn to be more assertive and forceful and learn parenting skills.

All this evidence makes it clear that, like the plaintiff in *Risley* and the other wrongful death cases where high awards were set or affirmed, this couple and family were extraordinarily close. That closeness was fostered by Darnell Dunn and his unquestioned devotion to his wife and family. However, unlike the surviving spouse in *Risley*, Etta Dunn faces a lonely future as a single parent of three dependent children—a young son who must face the difficult teenage years ahead without a father, a rebellious teenage daughter and an older son who has a hearing disability. The loss of her husband's love, support and companionship in raising their children is one of the most profound effects on the life of Etta Dunn. Under normal circumstances this can be an extremely difficult task, but the task is fraught with an overwhelming amount of difficulty, worry and anxiety when the children are also grief stricken and distraught because they have lost a strong and loving father.

Based primarily on this evidence and secondarily on the guidance provided by awards approved in similar cases by the Louisiana appellate courts and decisions of the Fifth Circuit, the court finds that $800,000.00 is the maximum amount the jury permissibly could have awarded. Obviously the jury found the plaintiff's testimony compelling and impressive and determined that there was an extraordinary level of closeness in the marriage and family. This amount gives deference to the role of the jury, and at the same time does not trigger the feeling that it is an award so large it clearly exceeds the amount that any reasonable person could feel the plaintiff was entitled to recover.

### General Damage Awards to the Surviving Children

■ The jury's award of $550,000.00 to each child also exceeds the bounds of any reasonable recovery. It is even higher than the highest past awards to surviving spouses. Yet, in its reassessment the court is not limited to the highest awards previously set or upheld in factually similar cases.[62] Again,

---

62. The surviving child in *Aime* was awarded $700,000.00. However, for the reasons already discussed, this decision does not provide a useful comparison. The court did not go into detail concerning the closeness of the decedent's relationship with his daughter, and it was evident that the $700,000.00 amount, unlike the present case, was compensation for many years of mental suffering.

See, *Marks*, 785 F.2d at 541. In *Marks* the four surviving children ranged in age from 16 to 20 on the date of the accident. The court affirmed a $250,000.00 award per child per parent and stated that the amount was within the parameter of the circuit's maximum recovery rule.

See, *Mathieu v. State, DOT & Dev.*, 598 So.2d 676, 682 (La.App. 3d Cir.1992), *cert. denied*, 600 So.2d 665 (La.1992). The court affirmed awards of $250,000.00 to three surviving children who were 27, 24 and 17 years of age at the time of

their father's death. The children had a very close and loving relationship with their father, who was described as loving, caring and devoted to his children.

At the time of trial, the highest award to a surviving child in a Louisiana wrongful death case was found in *Buckbee v. Aweco, Inc.*, 626 So.2d 1190, 1190–91 (La.App. 3d Cir.1993), *cert. denied*, 631 So.2d 1162 (La.1994). A surviving child, who had been adopted by the decedent at the age of four and one-half, was awarded $300,000.00. The decedent was devoted to his family and spent a lot of time with his son. The son was a teenager and in high school at the time of his father's death. He testified that he felt very close to his adoptive father who was the only father he had ever known; his father took an interest in his school work, and acted as a confidant and advisor. After the death of his father,

it is evident that the jury in this case was extremely moved and impressed with the testimony of Etta Dunn and the other witnesses regarding the effects of Darnell Dunn's death on each of the children. The evidence of record provides ample support for an award to each surviving child of an amount higher than $300,000.00.

Each of the children has been intensely affected by the loss of their father. Cedric is 20 years old and attended the School for the Deaf. At the time of trial he was attending the Southwest College for the Deaf in Texas so he could study auto body work. His mother testified when he heard his father was dead he screamed out loud. Since his father's death he cries at night and tries to hide his face. He is rebellious and cannot stay at home. Brabham described Cedric as dependent and still very angry about his father's death.

The evidence established that Ladriyka was also very close to her father and that since his death she cries and is very angry and rebellious. Brabham testified that he was concerned about Ladriyka's behavior. Her stress and depression were coming out in the form of rebellion that her father would not have tolerated.[63]

Brabham also testified concerning the grief and depression of the youngest son, John Preston.[64] He stated that John Preston experienced nightmares and sleepwalking and is suffering from a profound depression and grief reaction. He indicated that his mother will need to establish limits for him in order to instill confidence and security. Etta Dunn testified that John Preston cries, sleeps in his father's basketball shirts and that she would find him asleep in their bed with his father's shirt and pictures. His father helped him with his homework and now his grades have gone down and he is failing math. Both the plaintiff and Brabham testified that John Preston writes letters to his father and to God about his father's death.

■ Reassessment of a general damages award in a wrongful death case, like the decision whether an award must be reduced, cannot be supported entirely by rational analysis and is in large part inherently subjective.[65] Based on a review of the evidence, guidance from prior awards and in accordance with the maximum recovery rule, the verdict is reduced to the maximum amount the jury could have properly awarded— $400,000.00 each to Cedric, Ladriyka and John Preston Dunn for their anguish, grief and loss of the love, affection and companionship of their father.

### Special Damages for Funeral and Medical Expenses

■ Defendants also moved for remittitur of the award for funeral and medical expenses from $11,000.00 to $6,703.10.[66] Defendants contended the $11,000.00 awarded by the jury included an amount to compensate the plaintiffs for post-accident psychological care. Defendants asserted that under Louisiana law these special damages cannot be recovered in a wrongful death action where a plaintiff receives a general award that includes compensation for grief. Defendants relied upon the decision in *Transco Leasing Corp. v. United States*, 896 F.2d 1435, 1455 (5th Cir.1990), *vacated in part*, 992 F.2d 552 (5th Cir.1993), and the Louisiana cases cited in that opinion, *Lang v. Prince*, 447 So.2d 1112, 1119–20 (La.App. 1st

---

the son's depression over his death affected his school performance and he dropped out of high school after his junior year.

**63.** Reverend Gregory V. White also testified at trial and stated that since her father's death Ladriyka has been withdrawn, rebellious and disobedient.

**64.** John Preston was born in 1982.

**65.** *Caldarera*, 705 F.2d at 784.

**66.** Defendants stated in their memorandum that $6,703.10 represented the total funeral expenses ($5,384.60) and medical expenses ($926.50 and $392.00) proven at trial. The court has examined the trial exhibits documenting these expenses and it appears that the defendants have erred in the amount of hospital expenses. Plaintiffs' exhibits 123 and 131 establish funeral expenses of $5,384.60 and $392.00 for emergency medical services. However, the bill from Earl K. Long Hospital, exhibit 130, is for $162.50, not $926.50. The court will use the amount set forth in the exhibit, for a total of $5,939.10.

Cir.1984), *cert. denied,* 450 So.2d 1311 (La. 1984), and *Meyers v. Smith,* 482 So.2d 60, 63–64 (La.App. 5th Cir.1986). Plaintiffs argued in opposition that the rationale of *Lang* and *Meyers* is no longer viable in light of *Lejeune v. Rayne Branch Hosp.,* 556 So.2d 559 (La.1990). Defendants pointed out in their reply memorandum that the *Lejeune* decision would not apply under the circumstances of this case.

Plaintiffs' attempt to rely on *Lejeune* is unavailing. Plaintiffs stated that *Lejeune* recognizes a cause of action for mental distress experienced by a claimant resulting from an injury sustained by a third person. This statement does not accurately convey the holding in that case. *Lejeune* recognized a cause of action for a certain class of plaintiffs who suffer emotional distress as a result of viewing an accident or injury-causing event that occurs to another. The cause of accident is limited to plaintiffs who have a close relationship with the victim and either view the accident or come upon the accident scene very soon thereafter and before substantial change has occurred in the victim's condition. The court specifically excluded damages for mental pain and anguish for those who do not view the accident or come upon the scene, but rather merely learn of another's traumatic injury. *Lejeune,* 556 So.2d at 570 n. 11. It is clear that *Lejeune* does not apply under the circumstances of this case and that the plaintiffs may not be compensated for the medical expenses incurred for their post-accident psychological care.

Accordingly, the motion for partial new trial on the issue of general damages and medical expenses is granted, unless within 10 days the plaintiffs accept a remittitur of the general damages awarded to Etta Dunn to $800,000.00, a remittitur of the general damages awarded to Cedric Darnell Dunn, Ladriyka Dunn and John Preston Dunn to $400,000.00 each, and a remittitur of the award for funeral and medical expenses to $5,939.10.